IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KENNETH EUGENE WILSON,
            Petitioner,

      vs.                                        No. 19-3260-JTM

SAM CLINE, Warden,
    El Dorado Correctional Facility,
            Respondent.

MEMORANDUM AND ORDER

This matter is before the court on Kenneth Wilson's petition for federal habeas corpus relief pursuant to 28 U.S.C. § 2254. In 2009, a Kansas jury found Wilson guilty of first degree premeditated murder, aggravated burglary, burglary, and possession of a firearm by a felon.[1] *State v. Wilson,* Case No. 08-CR-30. (D. Osborne County, Kan.). On June 23, 2009, the state court sentenced Wilson to a term of life plus 158 months imprisonment. The Kansas Supreme Court subsequently affirmed the convictions and sentence. *State v. Wilson*, 295 Kan. 605, 289 P.3d 1082 (2012).

Wilson's first attempt at collateral relief under K.S.A. 60-1507 (Case No. 12-CV-16) was denied by the district court on March 5, 2014, a decision affirmed by the Kansas

---

[1] In violation, respectively, of K.S.A. 21-3401(a)), 21-3716, 21-3715(a), and K.S.A. 21-4204(a)(4).

Court of Appeals on September 4, 2015. *Wilson v. State*, 355 P.3d 722 (Table), 2015 WL 5311404 (Case No. 111,962) (Kan. App. 2015).

Wilson's second 60-1507 motion (Case No. 16-CV-7) was summarily denied as premature by the district court on May 20, 2016, and the Kansas Supreme Court denied review of that decision on June 21, 2016. On August 25, 2017, the Kansas Court of Appeals found that the issues raised in the second 60-1507 motion had become ripe, and remanded the case back to the district court for further consideration. *Wilson v. State*, 400 P.3d 679 (Table), 2017 WL 3669061 (Case No. 116,318) (Kan. App. 2017). The district court denied the second motion on February 13, 2018. The Kansas Court of Appeals affirmed this decision on June 21, 2019. Wilson did not seek Kansas Supreme Court review of this decision.

Wilson is currently imprisoned at the El Dorado Correctional Facility in El Dorado, Kansas. In his present petition, he argues that his state trial and appellate counsel were constitutionally ineffective.

The Kansas Supreme Court summarized the underlying facts of the case in its 2012 decision:

> Wilson's first-degree murder, aggravated burglary, and criminal possession of a firearm convictions stem from the burglary of the home of Scott and Carol Noel ("the Noels") on March 25, 2008, and the murder of Scott Noel in his home that same date.
>
> Carol Noel testified at trial that she and Scott both left their rural home, which was 1 mile south of Portis and approximately 1/2 mile from Highway 281, about 7:30 a.m. on March 25, 2008. On a typical day, Scott, a farmer, would return home for lunch at noon.

When Carol returned home at 4 p.m., things were "topsy turvy." As she entered the dining room, she saw that dining room chairs had been knocked over, the table cloth was on the floor, and money she had left that morning on the dining room table for Scott was gone. As Carol entered the kitchen, she saw one of her husband's guns lying on the kitchen table, although Scott always kept his unloaded guns in the closed gun cabinet. She then saw Scott lying dead on the kitchen floor in a pool of blood, his hands tied behind his back. Carol frantically called 911 and, at the direction of the dispatcher, waited outside until law enforcement arrived. The coroner later determined Scott died of a contact gunshot wound to the back of his head and that he had been severely beaten shortly before he died, as evidenced by several bruises and abrasions on his body. The coroner testified there was no evidence that Scott had fought back or taken any defensive measures.

Cory Latham, an investigating officer with the Kansas Bureau of Investigation, testified that when the murderer pulled the trigger, he likely was standing over Scott, who lay on his stomach on the floor with his hands tied behind his back with a computer cord.

During the subsequent investigation, officers found a cigarette butt in the Noels' sun room, although neither Carol nor Scott smoked cigarettes. Laboratory testing of the cigarette butt revealed a DNA profile that matched Wilson's DNA profile.

Wilson's former wife, Sharon Wilson, testified that in March 2008, she and Wilson were still married and lived together in a home in Salina. Sharon testified that from March 24, 2008, through March 29, 2008, Wilson was away from home on a trip with his friend Delbert McBroom, who was staying in an RV owned by the Wilsons in the Wilsons' backyard. Sharon believed that Wilson and McBroom were going to western Kansas to look for oil rigging jobs. Sharon also testified that Wilson and McBroom were gone on a trip on March 14, 2008, although she could not recall how long they were gone on that trip. Sharon testified Wilson was known to smoke cigarettes.

Two witnesses testified they saw an unfamiliar car matching the description of Wilson's car leaving the Noel house about the time of the murder.

*Burglary conviction*

Wilson's burglary conviction stems from a burglary of Elinor Fink's home that occurred on the same day Scott Noel was murdered. Fink lived west of Downs on U.S. Highway 24 approximately 3 miles from the Noels' farm. On March 25, 2008, she went to lunch at the Downs senior center around 11 a.m. When she returned home about 12:45 p.m., she discovered her home had been broken into, ransacked, and all of her jewelry taken. She called 911 and reported the burglary. Several pieces of Fink's jewelry were later found in a search of Wilson's home.

*Wilson's defense*

Wilson testified in his own defense and denied committing the crimes charged. He admitted he was on a trip from March 24 to March 25, 2008, and that he drove from Salina to Fairbury, Nebraska, and back to Salina on that trip, but he claimed he was hauling suitcases in return for payment from a man he had "done time with." Wilson also admitted he drove all over Kansas the week of March 12, 2008. Regarding the items from numerous burglaries found in his possession, Wilson claimed he bought several boxes of items from the man for whom he was hauling suitcases and then later learned the boxes contained the stolen items. Wilson was unable to offer any explanation as to why his DNA was found on cigarette butts in the Noel home and in the home of Joel Livgren, the victim of an uncharged burglary introduced into evidence under K.S.A. 60–455.

Wilson testified regarding his two prior felony convictions. The first he explained by saying that he was convicted of "purse snatching" after he "beat a woman unmercifully" because she looked like his ex-fiancée. In cross-examination, he conceded he was convicted of robbery in the first degree. The second offense, which Wilson said occurred after he served 18 months in prison for the first offense, resulted after he again saw a woman who looked like his ex-fiancée and he "put a knife through her throat and mock-raped her." Wilson explained that he was convicted of rape and aggravated kidnapping for that incident and incarcerated for 18 years before his release in 2002.

Wilson said he was eventually arrested in June 2008 when he violated his parole by driving with a suspended license.

4

       In cross-examination, Wilson was presented with a letter he wrote to McBroom after Wilson was jailed for the parole violation. He admitted to writing the letter, which asked McBroom to find out where Wilson's parole officer lived and to "try and get some leather gloves and stocking caps rounded up on the sly."

       Wilson admitted that he was angry with his parole officer, that threatening and intimidating was "part of [his] character," and that his purpose in asking where his parole officer lived had to do with this character. However, he claimed that although he threatened and intimidated people all the time, he didn't necessarily "go as far as to carry those things through," and he claimed he had no intention of threatening his parole officer. He further suggested that he asked McBroom to round up gloves and stocking caps on the sly for innocent reasons, namely because he liked to fish "neck deep in water in the river, [and] it gets mighty cold."

*State v. Wilson*, 295 Kan. 605, 607-10, 289 P.3d 1082, 1086-88 (2012).

       In the present proceeding, the court presumes the validity of the state court's factual findings, in the absence of clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254 (e)(1); *Saiz v. Ortiz*, 392 F.3d 1166, 1175 (10th Cir. 2004). The court has carefully reviewed the evidentiary record from the state trial, and finds no substantial evidence demonstrating the factual findings of the state court were untrue. Those findings were accurately summarized by the Kansas Court of Appeals in its 2012 opinion, and the court adopts and incorporates herein the factual findings in that decision relating to the charges and evidence against Wilson; as well as the events which occurred during the trial, the sentencing, the direct appeal, and the subsequent motion arguing ineffective assistance of counsel.

A federal court reviews a state prisoner's challenge to matters decided in state court proceedings pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which "requires federal courts to give significant deference to state court decisions" on the merits. *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013). A federal court may not grant a state prisoner habeas relief with respect to "any claim that was adjudicated on the merits in State court proceedings" unless the prisoner can show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established law" refers to the Supreme Court's holdings, as opposed to its dicta. *Lockett*, 711 F.3d at 1231. A state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (quotations omitted).

The constitutional right to counsel has been violated if (1) the defense counsel's performance fell below an objective standard of reasonableness, and (2) that deficient performance prejudiced defendant's case—but for his counsel's errors, the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, the court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance; that

is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. When a claim of ineffective assistance of counsel is advanced under the AEDPA, prior state adjudications of ineffectiveness claims are entitled to "doubly deferential" review. *Woods v. Etherton*, ___ U.S. ___, 136 S.Ct. 1149, 1151, 194 L.Ed.2d 333 (2016); *Cullen v. Pinholster*, 563 U.S. 170, 189-90, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

Thus, in evaluating application of a general rule such as that in *Strickland*, the AEDPA provides significantly more leeway to state courts in reaching case-by-case determinations. *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014). The court must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Pinholster*, 563 U.S. at 190 (internal citations omitted). With respect to allegations of ineffective assistance of counsel, the federal court may grant habeas relief "only when the petitioner shows 'there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (citing *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786, 178 L.Ed.2d 674 (2011)). Even a "strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in state court and based on a factual determination will not be overturned on

factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003).

Wilson argues that his trial attorney was deficient in failing to obtain the suppression of various items of evidence taken after the search of his house pursuant to a warrant. In particular, Wilson challenges the admission of seizure of the following items of evidence as beyond the scope of the warrant:

> Item 8 consisted of United States savings bonds which Undersheriff Troy Schaefer found in a stack of paperwork located under a pile of clothing on the floor of Wilson's bedroom. The bonds were found inside an envelope and contained a name and address of someone who did not reside in the home.
>
> Item 17 consisted of a black case containing 24 compact discs, and a black and blue case containing 122 compact discs. Officers found these in the dining room of Wilson's residence, on top of a filing cabinet next to a computer desk. Three of the compact discs inside the cases were marked "T. Pope," and the search warrant listed "documentation identifying Terry and/or Tara Pope."
>
> Item 19 was a brown lockbox which contained plastic bags with over 150 pieces of jewelry in them, including some imitation pearl necklaces and a fake gold coin pendant matching the description of one stolen from Elinor Fink.
>
> Item 22 was a green fishing bag or fanny pack found in the basement of Wilson's residence. It contained a 1–gallon bag of assorted watches, and a grey cloth bag which also had wrist and pocket watches inside it.
>
> Item 25 was a blue flowered pillowcase seized from the hallway closet of Wilson's residence. Officers seized it because during their search, they had received a fax from the Gosper County, Nebraska Sheriff's Office listing a blue flowered pillowcase as one of the items stolen in a March burglary, and a photograph of the pillowcase, which matched the one they seized.

2015 WL 5311404 at *3; (see also R. V, 47-53, 64-65, 92, 102-05.).

8

Wilson's trial attorney has testified that he made his decision not to seek suppression of the evidence for several reasons. First, he believed such a motion would be unsuccessful under the circumstances of the case, given the testimony at the preliminary hearing. Moreover, he did not want to place Wilson in the position of claiming knowledge of the evidence found in his home. Rather, through cross-examination of witnesses, Wilson's attorney wanted to create doubt as to whether the items were actually stolen, and to provide innocent explanations as to how some of the items came to be there.

The district court denied Wilson's motion, finding that neither of the Strickland grounds for relief was satisfied. First, it determined that counsel's performance was not deficient, given the weakness of the argument for suppression and the decision to follow a different trial strategy. Second, Wilson could not show prejudice due to the failure to file a suppression motion because it would not have succeeded. The Kansas Court of Appeals affirmed this decision, although it focused solely on the second prong of the constitutional guarantee, prejudice. *Wilson v. State*, 355 P.3d 722 (Table), 2015 WL 5311404 at *2-6 (Case No. 111,962) (Kan. App. 2015). That is, the court found that, even if the specific items of evidence were indeed suppressed, the remaining evidence was so strong that the result would have been the same. "[E]ven had the court suppressed the challenged evidence, other facts properly admitted at trial provide overwhelming circumstantial evidence that [Petitioner] committed all of the charged crimes." *Id*. at *6.

The following evidence relating to the charges against the petitioner is well-supported in the trial record and is unchallenged:

Tracy Noel's home in Gove County was burglarized during the day on March 12, 2008. Jewelry, cameras, video games and accessories, and a pillowcase were taken. The video games and accessories were recovered from the RV parked in Wilson's back yard.

Terry and Bernice Blakely's home near Beeler, in nearby Ness County, Kansas, was burglarized that same day. Pillowcases, jewelry, and watches were taken. Mr. Blakely's rifle had been removed from its closet, loaded, and placed on top of the deep freezer. Cigarette butts were found in the yard, although neither Terry nor Bernice Blakely smokes.

The next morning, Loa Hagelgantz was driving up the driveway to her residence in rural Bazine, also in Ness County, Kansas, when she saw a stranger drive from behind her outbuildings. He stopped and asked her for directions to the nearest gas station. After the man drove away, she entered her residence, smelled cigarette smoke, noticed items out of place, and discovered her purse was missing. She subsequently described that car as having a Saline County license tag, as Wilson's did, and as matching the description of Wilson's car. She also identified Wilson from a photo array of 55 photographs as the man she spoke to on her property that day.

On March 14, 2008, Matthew Andrews' home was broken into sometime between 8:30 a.m. and 3:30 p.m. Andrews lived 2 miles north of Elwood, Nebraska, approximately 100 yards off Highway 283. Items missing from the Andrews home included a pillowcase, jewelry, a rifle, cash, silverware, binoculars, video games, and bonds.

On March 24, 2008, Tara Pope discovered that her residence outside of Saronville, in Clay County, Nebraska, had been burglarized. A laptop computer, digital camera, knives, binoculars, some jewelry, and cases with compact discs had been taken. At least three compact discs stating on them "T. Pope" were found in Wilson's home during the search. Those particular discs would not have been suppressed, even had a suppression motion as to other items been granted, since the search warrant specifically listed "documentation identifying Terry and/or Tara Pope."

10

That same day, Joel Livgren's home in rural Clay County, Nebraska, was also burglarized. One of the items taken from his home was a camera. That camera was specifically listed on the search warrant for Wilson's residence and was recovered from Wilson's bedroom. Police discovered a brown cigarette butt outside the door to the Livgren's home and it was subsequently found to match Wilson's DNA.

Betty Switzer's rural home near Harvard, in Clay County, Nebraska, was also burglarized in March. Jewelry and a microwave were stolen, and a microwave matching hers was recovered from the RV parked in Wilson's back yard during the search.

Carol Noel returned to her home in Downs, Osborne County, Kansas, from work on March 25, 2008, to find her husband, Scott Noel, dead in their kitchen. He was lying in a pool of blood, the house was a mess, and its back door was open. One of Scott's shotguns was lying on the kitchen table and the money Carol had left on the dining room table that morning was gone. She called 911 and left the house. The autopsy showed that Scott Noel died from a shotgun wound to the back of his head, likely fired from his own shotgun. Before being shot he had been severely beaten but there was no evidence that he had tried to fight back. The murderer likely stood over Noel, who lay on his stomach with his hands tied behind his back with a computer cord, when he shot him.

Police found a brown cigarette butt in the Noel's home that contained Wilson's DNA. Further, two local witnesses saw an unfamiliar car leaving the Noel house at the estimated time of the murder. Their description of that car matched Wilson's car.

That same day, Elinor Fink's home, located approximately 3 miles from the Noels' farm, was burglarized. Her home had been broken into and ransacked and all of her jewelry had been stolen. The burglar took, among other items, a metal lockbox, a fake gold coin pendant with a frame around it, and some imitation pearl necklaces. She called 911 and reported the burglary.

Wilson's wife testified that Wilson and a friend had taken trips together around March 12–14 and March 24–25, 2008, the dates of the crimes noted above. Wilson admitted that he had traveled extensively in Kansas during the weeks of March 12 and 24, 2008. Wilson stipulated that he was prohibited from legally possessing a firearm on March 25, 2008.

>Wilson admitted that he was unemployed and that money was "pretty tight," which provided a financial motive to commit the burglaries. Wilson's testimony was confusing and did not explain away the incriminating evidence against him.

2015 WL 5311404 at *3-4.

Here, "[t]he similarities between the uncharged burglaries and the charged burglaries helped prove identity—that Wilson was the person who committed the crimes." 2015 WL 5311404 at *5. All of the crimes involved burglaries of isolated, rural residences, near a highway in a limited area of north-central Kansas and south-central Nebraska. Id. All were committed in the same general timeframe, a time when the evidence established that Petitioner was away from his home in Salina. Id. Cigarette butts were found at the Noel, Blakely, and Livgren homes. Id. The evidence showed that Petitioner was a smoker; the residents of the homes were not. Id. And, most significantly, DNA profiles from the cigarette butts found at the Noel and Livgren homes matched Petitioner's DNA profile. 2015 WL 5311404 at *5. Further, Loa Hagelgantz identified Wilson in a photo lineup as the strange man she saw and spoke to outside her home the morning of the burglary. Id. And finally, many of the items taken during all the burglaries, were later found in Wilson's home and RV. Id.

The court finds that the Kansas courts' application of *Strickland*, and their conclusions that counsel was not unconstitutionally deficient, were not unreasonable. Both courts thoroughly reviewed the evidence and placed the challenged evidence in

the context of the entire case, including unchallenged DNA evidence linking Wilson to the murder scene and an eyewitness linking Wilson to another burglary.

Wilson's second argument—that his appellate counsel was ineffective in not raising trial counsel's failure to seek suppression of the additional items of evidence—is dependent on his first. If a suppression motion would have been unsuccessful (as the district court found), or, even if successful would not have altered the ultimate outcome (as both the district court and the Court of Appeals found), any failure on the part of the appellate counsel to raise the issue would not have altered the outcome. Further, this specific argument relating to the effectiveness of appellate counsel, was never presented to the state courts, and thus is not a proper basis for federal habeas relief. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

IT IS ACCORDINGLY ORDERED this day of February, 2021, that the Petition for Writ of Habeas Corpus (Dkt. 1) is hereby denied.

*J. Thomas Marten*
J. Thomas Marten, Judge

13